■ In the Matter of JOSE TORRES, Respondent. THE PEOPLE OF THE STATE OF NEW YORK et al., Appellants.—Order, Supreme Court, New York County (Kenneth Shorter, J.), entered December 21, 1989, which directed that defendant be transferred from a secure facility to a nonsecure facility in the custody of the Commissioner of Mental Health, affirmed, without costs.

Defendant killed a man in 1978 and was charged with murder in the second degree. He was found not responsible for the crime by reason of mental disease or defect and committed to the custody of the Commissioner of Mental Health in 1980.

Since that time he has been confined in various psychiatric facilities operated by the Office of Mental Health, except for a brief period when he escaped in 1984 and upon his recapture when he was imprisoned in Rikers Island. Since 1985, Torres has been housed in Kirby Forensic Psychiatric Center, a secure facility.

The treatment of persons found not responsible for a crime by reason of mental disease or defect is governed by CPL 330.20. If a defendant is found to be suffering from a "dangerous mental disorder", he is committed to a secure facility. A "dangerous mental disorder" means that a person suffers from a mental illness *and* currently constitutes a physical danger to himself or others. (CPL 330.20 [1] [c].) If the defendant has a "mental illness", but not a dangerous mental disorder, he may be transferred to a nonsecure facility and detained pursuant to appropriate conditions imposed by the court. Retention orders issued pursuant to this statute are for a limited duration and must be periodically renewed by the Commissioner of Mental Health, and upon the application for a subsequent retention order, the court may order a hearing, at which "the commissioner must establish to the satisfaction of the court that the defendant has a dangerous mental disorder or is mentally ill" (CPL 330.20 [9]).

It is not disputed that defendant suffers from a mental illness, schizophrenia, paranoid type. The only issue on this appeal is whether defendant suffers from a *dangerous* mental condition, and accordingly, whether he must be confined in a secure or nonsecure facility.

At the hearing, the Commissioner presented the testimony of defendant's treating physician, Dr. Roman Klebanov, while defendant presented the testimony of an independent psychiatrist, Dr. Stuart Kleinman, who reviewed defendant's records and also conducted a lengthy interview and examination of the defendant.

The hospital records in evidence at the hearing show that in 1987 a court order was issued authorizing that defendant be medicated over his objections. In July 1988, Dr. Klebanov noted defendant's substantial improvement while on antipsychotic medication since that time and recommended that he be transferred to a nonsecure facility. The recommendation was approved by the forensic committee of the hospital, which stated that defendant showed continued improvement and no evidence of active psychosis. Finally, the recommendation for transfer to a nonsecure facility was approved by the clinical director of the hospital. However, this proposed transfer was

delayed as a result of a brief period of decompression, and the matter was deferred until the instant hearing before Justice Shorter.

At the hearing, Dr. Klebanov testified that the defendant was not suitable for transfer to a nonsecure facility because his minimal insight and inability to accept the fact of his mental illness would eventually lead to a discontinuation of medication and lead to an attempt to escape. Furthermore, Dr. Klebanov recounted allegedly violent incidents involving defendant and other patients at Kirby. However, these incidents are remote in time and occurred when defendant was still in a psychotic state and before he was treated with medication. The only recent incident occurred in a crowded elevator when another patient began arguing with the defendant, cursing and screaming at him and threatening to kick him. Under such real provocation, defendant turned around and hit the other patient once and did not attempt to hit him again.

The independent psychiatrist, Dr. Kleinman, testified that as a result of the medication, defendant no longer suffers from the psychotic beliefs that had previously made him dangerous. Dr. Kleinman agreed that defendant suffers from mental illness, schizophrenia, but opined that he would not be a danger to himself or others and was not an escape risk, so long as he took his medication. Notably, Dr. Kleinman is the director of a licensed mental health care facility that provides treatment to victims of crime and testified in favor of defendant's transfer notwithstanding his belief that he was particularly sensitive to issues of public safety and welfare.

In a proceeding brought by the Commissioner for a subsequent retention order pursuant to CPL 330.20 (9), the Commissioner of Mental Health has the burden of demonstrating to the satisfaction of the court, by a preponderance of the evidence, that defendant suffers from a dangerous mental disorder in order to retain him in a secure facility (*People v Escobar,* 61 NY2d 431). Here, the Commissioner failed to meet that burden. The main proof offered was Dr. Klebanov's opinion that defendant should not be transferred to a nonsecure facility. However, that opinion was based on speculation that defendant was mentally ill and that should he discontinue his medication he may attempt to escape. However, to find that defendant has a "dangerous mental disorder" the statute requires a showing that defendant "currently constitutes a physical danger to himself or others" (CPL 330.20 [1] [c]). Dr. Klebanov's opinion does not establish that defendant

*currently* poses a danger, but would pose such a threat only in the event that he discontinue his medication in the future. However, this possibility is expressly provided for in the court's "ORDER OF CONDITIONS" attached to defendant's transfer, conditioning the transfer on the continued acceptance of medication. As further evidence of defendant's danger, Dr. Klebanov and the Commissioner point to the violent incident in the elevator; however, this was an isolated incident in response to a real threat and does not support a finding of current danger if defendant is transferred to a nonsecure facility.

The dissent also argues that the violent and psychotic nature of the crime with which defendant was originally charged militates in favor of continued retention in a secure facility. However, the nature of the prior criminal act for which the detainee was acquitted is insufficient, without more, to demonstrate a *current* danger which would preclude his release or transfer. *(Matter of Torsney [State Commr. of Mental Hygiene—Gold],* 47 NY2d 667, 676.) Here, the evidence at the hearing showed that so long as defendant takes his medication, he is no longer psychotic or dangerous as he was at the time of the original incident.

The dissent also chooses to accord greater weight to the expert opinion of Dr. Klebanov than that of Dr. Kleinman. Such a determination is better left to the trier of fact, who had the opportunity to hear and observe the conflicting opinions of the expert witnesses. There is nothing in the record to discredit the opinion of Dr. Kleinman, an independently appointed expert whose expertise includes the treatment of victims of crime, or the court's reliance on his independent judgment, without any bias on behalf of the defendant, that defendant does not pose a *current* danger.

In sum, the hearing court's determination that the State failed to establish that defendant suffers from a dangerous mental disorder is supported by the evidence and the order transferring defendant to a nonsecure facility, under the express condition that he continue medication, should be affirmed. Concur—Ellerin, Wallach and Rubin, JJ.

Kupferman, J. P., and Smith, J., dissent in a memorandum by Smith, J., as follows: The People established by a preponderance of the evidence that the defendant has a dangerous mental disorder and should continue to receive treatment in a secure facility. *(People v Escobar,* 61 NY2d 431 [1984].)

In August 1989 the Commissioner of Mental Health made

an application pursuant to CPL 330.20 (9) to retain the defendant at a secure facility. That section provides that at least 30 days prior to the expiration of a retention order, the Commissioner of Mental Health shall apply to the court for a subsequent retention order or a release. The section also provides that the court may "conduct a hearing to determine whether the defendant has a dangerous mental disorder".

CPL 330.20 (1) (c) states: " 'Dangerous mental disorder' means: (i) that a defendant currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others."

Mental Hygiene Law § 1.03 (20) states: " 'Mental illness' means an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation."

A hearing was held at which the Commissioner presented the testimony of Dr. Roman Klebanov and the defendant's psychiatric records. The defendant presented the testimony of an independent psychiatrist, Dr. Stuart Kleinman.

The preponderance of the evidence to retain the defendant was clearly established.

First, on or about November 10, 1978 the defendant shot and killed a stranger whom he believed was part of a conspiracy to kill him. In 1980 he was acquitted of that killing by reason of mental disease. Since that time, the defendant continuously has been kept in secure psychiatric facilities except for a brief period when he was incarcerated following his escape in 1984 from Manhattan Psychiatric Center.

Second, it is undisputed that the defendant suffers from schizophrenia, paranoid type. The only issue is whether he constitutes such a danger to himself and/or society that he should presently remain in a secure facility.

Third, in the report which accompanied the request for retention of the defendant, the Commissioner indicated both that the defendant had been involved in violent behavior at the Kirby Forensic Psychiatric Center and that the defendant's illness continued. Specifically, the report, written by the treating psychiatrist, Dr. Klebanov stated:

"Assessment of Dangerousness * * *

"While at Kirby Forensic Psychiatric Center the patient

was involved in several incidents. On April 12, 1987 when he poured hot water on another patient. On June 20, 1987 there was a fight with one patient and on June 20, 1987 Mr. Torres slapped another patient.

"On May 8, 1989 the patient was sexually provoked by one of the patients on the ward which led to a fight between them. On June 2, 1989 the patient hit another patient in his face, which resulted in a laceration of the upper lip. The patient has no PIV (Potential Identified Victim).

"Course of Hospitalization: During the course of treatment during this hospitalization he was an extremely paranoid man who believes that there are a number of conspiracies against him. His greatest problem occur [sic] at night during hours of sleep. He believes that people harm him at night and has accused patients and staff of such things as playing with his feet, breaking various bones in his body and performing operations. He offered frequent somatic complaints which are bizarre and delusional in quality. He used to speak of scars on his body due to operations (non-visible). In general he thought that every part of his body is deteriorating and he holds others responsible for his plight. While he is quite articulate and seems to be of [at] least average intelligence, thought content was bizarre and associations during stressful periods [were] quite loose.

"The patient had been poorly compliant with his treatment plan; refused to take antipsychotic medication which resulted in the hospital application for the forced medication in 1987. Since September 21, 1987 Mr. Torres has been medicated with IM Prolixin Dec. 25 mg. every two weeks (this medication was also very helpful to his mother, a paranoid schizophrenic). He showed improvement. Recently the patient became once again manipulative and demanding the charge [sic] of his current medications (IM Prolixin Dec. 25 mg. every two weeks).

"Recommendations: Although the patient's mental illness has been partially stabilize [sic] he continues to maintain strong beliefs that the people may have dangerous tendencies toward him, and harassing him. The patient may and has been acted [sic] upon his delusional ideas. Provided that [sic] the patient committed instant offense in the midst of paranoid psychotic episode as well as above mentioned behavior, it is my opinion that Mr. Torres needs further retention and treatment in a secure facility."

Fourth, and in my view of particular importance, is the opinion of the treating psychiatrist. Dr. Klebanov's opinion

was that the defendant suffered from a mental disease and that he should be retained in a secure facility. Dr. Klebanov also testified that the defendant had improved with medication but that he resisted taking the medication, had refused to take it on occasion, and would decompensate within a short period of time if he did not take it. His recommendation to retain the defendant was supported by the forensic committee at the secure facility and by its clinical director. Dr. Klebanov had first examined the defendant in January 1987 and, at the time of the hearing, had almost daily contact with him.

It should also be noted that Dr. Klebanov and the forensic committee at the facility had previously decided to recommend that the defendant be transferred to a nonsecure facility but had withdrawn that recommendation following the defendant's decompensation upon learning of the possibility of transfer.

Dr. Kleinman, on the other hand, had seen the defendant for only 1½ hours. In addition, he had read some of the medical records. While he agreed that the defendant was suffering from schizophrenia, paranoid type chronic, he believed that it was in remission and that the defendant would not be a danger to himself or others as long as he took medication. He stated that the defendant was likely to deteriorate if he failed to take his medication.

Based on this record, I believe the Commissioner established a case for the continued treatment of the defendant in a secure facility. The fact that medication has improved the defendant's condition is not determinative given the evidence of the necessity for continued treatment in a secure facility.